**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael T. McHUGH, Defendant–**
**Appellant.**

**No. 933, Docket 96–1484.**

United States Court of Appeals,
Second Circuit.

Submitted Feb. 21, 1997.

Decided Sept. 4, 1997.

**154**

Thomas J. Maroney, United States Attorney, John G. Duncan, Assistant United States Attorney, Syracuse, NY, Submitted a brief for Plaintiff–Appellee.

Joseph E. Fahey, Wiles & Fahey, Syracuse, NY, Submitted a brief for Defendant–Appellant.

Before: NEWMAN, Chief Judge, McLAUGHLIN, Circuit Judge, and OWEN, District Judge.[1]

OWEN, District Judge.

Defendant–Appellant Michael T. McHugh, a tugboat captain, pleaded guilty in the District Court for the Northern District of New York to an information charging him with involuntary manslaughter[2] by criminal negligence in the drowning deaths of two crew members on a barge that sank while he was towing it across Lake Ontario in 1993. He was sentenced to 12 months on each count to run concurrently.[3]

Section 1112 reads:

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

. . .

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112(a).

Section 1112 provides for a maximum penalty of six years and a fine of $250,000. It does not distinguish between "criminally negligent" and "reckless" conduct. The Commentary to § 2A1.4 of the United States Sentencing Commission Guidelines ("U.S.S.G." or "guidelines") applicable to § 1112, however, elaborates as follows:

"Reckless" refers to a situation in which the defendant was aware of the risk created by his conduct[4] and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation. "Criminally negligent" refers to conduct that involves a gross deviation from the standard of care that a reasonable person would exercise under the circumstances, but which is not reckless.

McHugh's plea incorporated an extensive written agreement. In that agreement, he stipulated that his conduct was criminally negligent for which a base offense level of 10 is established by the guidelines with a sentencing range of 6–12 months. The District Court thereafter, however, having assessed

---

1. Honorable Richard Owen, of the United States District Court for the Southern District of New York, sitting by designation.

2. 18 U.S.C. § 1112 (1994).

3. Also imposed were concurrent sentences of two years supervised release, a fine of $10,000 and a special assessment of $100 not material to this appeal.

4. (Footnote by the Court) It is essentially the awareness of the risk that distinguishes "reckless" from "criminally negligent" conduct.

McHugh's written statement of facts, rejected McHugh's stipulation of criminal negligence and made its own finding that McHugh's conduct was reckless with a base offense level of 14 increased to 16 because there were two counts, *see* U.S.S.G. § 3D1.4, and reduced to 13 by reason of McHugh's acceptance of responsibility, *see id.* § 3E1.1(b), and a resulting sentencing range of 12–18 months. We observe that the sentence of 12 months then imposed by the District Court was at precisely the point where the two sentencing ranges overlap.

McHugh appeals from the District Court's determination that his conduct was reckless and from the court's refusal to permit him to withdraw his plea of guilty following its rejection of his stipulation to criminally negligent conduct.

The facts of the tragedy giving rise to this case are best set forth in the "statement of relevant facts" in the plea agreement which appellant McHugh signed:

[D]uring the fall of 1993 defendant [McHugh] was a principal in J & M Marine Towing, 104 Rutledge Street, Syracuse, New York, a licensed Merchant Mariner and Operator of the CL No. 1, a 53' tugboat;

In October of 1993, defendant MICHAEL T. McHUGH entered into an oral agreement with Kevin Decker, a representative of Royal Barges Inc. of Syracuse, New York to tow two wooden barges, of early 1900's construction, from Point Pleasant, New York to the Syracuse area. The barges were to be brought across Lake Ontario to Oswego, a distance of approximately 45 miles, and then through the New York State Canal System to Onondaga Lake.

Several weeks prior to the tow, defendant inspected the barges which were bottomed in shallow water at Point Pleasant in Chaumont Bay. The smaller barge, measuring approximately 28' × 80' and the larger, 30' × 90', were fitted with a restaurant and lounge. At the time of defendant's inspection he was aware the barges were undergoing substantial repairs to enable them to be floated for the tow.

A marine surveyor hired by Royal Barges Inc., Kenneth Johnson, advised defendant of the necessary wind and wave conditions under which the barges could be safely towed. Johnson, a retired U.S. Coast Guard Commander, told defendant that the transit had to be made slowly and under ideal weather conditions that should include winds less than ten knots, and seas less than two feet.

Several weeks later, in mid-November, defendant purchased a used 53 foot tugboat, the CL No. 1, in the Baltimore area. It was defendant's intent to use only this single vessel to tow both barges although he also owned a second smaller tug. The CL No. 1 was equipped with radar, a VHF radio capable of receiving U.S. and Canadian marine weather forecasts and three immersion suits. Having completed the purchase, defendant and two crew members, one of whom was Calvin Lockney, proceeded from the Baltimore area to New York City with the CL No. 1. They then came upstate through the canal system, arriving at the Port of Oswego on November 24th.

On the morning of November 25th, with his two crew members, defendant attempted to set out for Point Pleasant but had to turn back after failing to make headway in heavy weather and 6–8 foot seas. Defendant set out again later in the day arriving at Point Peninsula shortly before midnight.

Prior to defendant's arrival, Royal Barges Inc. had equipped each of the barges with several gasoline operated bilge pumps and a generator to keep them afloat during the transit and power running lights. For the trip, two crewmen were to be stationed on each barge to keep the pumps running. After his arrival, Calvin Lockney joined with Gregory Cook as the crew on the smaller barge. Although defendant was aware that each barge would be manned, he remained onboard the CL No. 1 and made no inspection of the them [sic] to assess their seaworthiness. Defendant also knew that the transit would be made in cold water conditions with a water temperature of approximately 45 degrees, but did not determine if any provision had been made on the barges for life rafts or immersion suits.

In preparation for the tow, a line was first connected from the CL No. 1 to the smaller barge. An effort was made to connect the larger barge behind the smaller, but the lines between the two barges broke. It was decided to leave the larger barge behind.

At approximately 5:00 p.m. on November 26th, pulling only the smaller barge manned by Gregory Cook and Calvin Lockney, defendant proceeded through Chaumont Bay toward Stony Point. Although the weather was clear and the water calm for some time after the tow was commenced, defendant acknowledges that an experienced licensed mariner would be aware that weather conditions on Lake Ontario can rapidly change from calm to severe. Defendant also acknowledges an experienced mariner would know that rough seas and gale force winds are most prevalent on the east end of Lake Ontario in late fall; that weather checks both before and after getting underway are a necessity. Defendant admits that although he was equipped with an operational VHF marine radio, at no time prior to leaving Point Pleasant or during transit did he ever check either U.S. or Canadian marine weather forecasts for any possible weather changes.

Defendant admits that for more than an hour in advance of his 5:00 p.m. departure from Point Pleasant both the U.S. National Weather Service and Canadian marine weather services were broadcasting severe weather warnings for Lake Ontario. Defendant acknowledges that the U.S. National Weather Service, Buffalo, issued an updated forecast at 3:38 p m that afternoon announcing that a gale warning was in effect for Lake Ontario; that southeast winds of 15–25 knots were predicted that night, building to 35 knots, Saturday; that waves of 4–6 feet were predicted that night, building to 5–8 feet, Saturday. Environment Canada broadcast similar severe weather warnings. While these forecasts were given continuously by both weather services, defendant acknowledges he never listened to them. He admits these predicted wind and wave conditions were well in excess of those specified by the marine surveyor to safely tow the barge.

Defendant passed Stony Point at approximately 9:30 p.m. on a southwesterly course heading into open water. For several hours, as defendant proceeded toward Oswego, the wind and wave conditions gradually worsened. With the barge being pulled approximately 600 feet behind defendant's vessel, the crew had only a flashlight to communicate with the CL No. 1. An earlier effort to provide a usable VHF radio failed. As time went on, conditions became increasingly severe. Only then did defendant hear on VHF channel 16 of small craft warnings. The weather continued to deteriorate. From the tug, waves were observed going over the bow and sides of the barge and its generator powered running lights went out. From inside the barge, someone was observed waving the flashlight.

Then, at about 2:00 a.m. on November 27th, approximately six miles north of Oswego Harbor, the barge began to break apart and sink. Waves were estimated to be 6–8 feet and the wind at 30 knots. Calvin Lockney was observed jumping into the water with only a type I PFD. Defendant radioed a "Mayday" advising that the barge had sunk. He also reported incorrectly that it had three men on board. Defendant then attempted to come about with the CL No. 1 to reach Lockney but the tow line became entangled in the tug's propeller causing the engines to be shut down or disengaged. In response to the Mayday call, several large vessels in the area responded to the scene along with U.S. and Canadian air rescue support. The body of Calvin Lockney was located and subsequently pulled from the water by a U.S. Coast Guard rescue team. Although a weak pulse was initially found, he did not survive. His death was determined to be the result of drowning. A second type I PFD was observed in the water but the body of Gregory Cook was never found. He is presumed dead.

MICHAEL T. McHUGH admits that the standard of care that a reasonable captain of a vessel would exercise under

the circumstances described above would include the following: knowledge of Lake Ontario weather patterns, especially in late fall; periodic checks of marine weather forecasts both before and during transit; adherence to wind and wave conditions specified by the marine surveyor for safe transit; given that a crew was onboard, a physical inspection of the barge to ascertain the extent it was seaworthy; provision for suitable communication devices between the tug and barge crew; given cold water conditions, provision for a lifeboat, and immersion suits for each crew member; given only one towing vessel was to be utilized for the transit, provision for a suitable rescue plan for the barge crew.

MICHAEL T. McHUGH admits that his conduct as Captain and operator of the CL No. 1 under the circumstances above described was a gross deviation from the standard of care that a reasonable licensed mariner would exercise as captain and operator of a tugboat.

█ At the outset we note that McHugh acknowledged that his conduct subjected him to a level 10 sentencing guideline range of 6–12 months as provided for in U.S.S.G. § 2A1.4(a)(1), and he was in fact sentenced to a 12 month term, albeit under the "reckless" guidelines. His briefing to us does not take issue with the length of the sentence. Accordingly, his appeal appears at most to be from the fact that the court below, while sentencing within the range to which he had consented, was thereby making a pronouncement that his conduct was in fact "reckless" and not merely "criminally negligent". For the reasons set forth hereafter, we conclude that his appeal is without merit.

First, McHugh stated in his plea agreement that:

the United States and defendant agree to stipulate at sentencing that defendant committed the crime of involuntary manslaughter through his criminal negligence and that the base offense level to be applied to Counts 1 and 2 of the Information is a level ten as provided for in U.S.S.G. § 2A1.4(a)(1). *It is understood, however, that the above agreement to stipulate cannot and does not bind the sentencing*

*Court, which may make independent factual findings and reject any or all stipulations presented by the parties.* (emphasis supplied).

He further agreed that "[a] subsequent determination that any stipulation is not binding on the court . . . shall not be the basis for the withdrawal of a plea of guilty by Michael T. McHugh." The plea agreement also provided that:

*the sentencing court will determine,* prior to sentencing, *what Guideline range is applicable to [him]* and may thereafter be required to sentence him to at least the minimum term of imprisonment and the minimum fine prescribed by that range. It is further understood that *the sentencing court may,* in its discretion, sentence Michael T. McHugh to the maximum term of imprisonment and the maximum fine which are consistent with the above Act and Guidelines, and may, *under some circumstances, depart from those Guidelines and sentence the defendant up to and including the statutory maximum term of imprisonment* and statutory maximum fine set forth above. (emphasis supplied).

Finally, McHugh in his statement of facts acknowledged that he had an awareness of the risk to his minimally seaworthy barges and his crew at that time of year; he knew that rough seas and gale force winds could develop rapidly and destroy his tow; he knew he must periodically check marine weather forecasts before and during the tow; nevertheless, he utterly failed to check the weather forecast before setting out, which would have informed him that a gale warning was in effect with winds blowing to 35 knots and seas rising to 5 to 8 feet; and he failed to make adequate provisions for his crew on the barge or adequate provisions for communication between the barge and the tow. The District Court, therefore, had justification for its finding that McHugh had an awareness of the risks making his conduct a "reckless" gross deviation from the standard of care that a reasonable licensed mariner would exercise particularly when instructed not to put out with this tow except "in ideal weather conditions with winds less than 10 knots, and seas less than two feet."

■ Notwithstanding the fact, however, that the Court below sentenced McHugh under the "reckless" guideline, the sentence imposed was also within the guideline range for criminal negligence to which McHugh had specifically consented at the point of overlap with the guideline range for reckless conduct. While, generally, a sentencing judge should specify that the same sentence would have been imposed had the proper guideline been applied, *U.S. v. Bermingham*, 855 F.2d 925, 934 (2d Cir.1988), it is clear that the Court below would have imposed the same 12 month sentence had she specifically imposed it under the criminal negligence guideline.

Accordingly, a remand is not required for this question to be resolved. We affirm.

JON O. NEWMAN, Circuit Judge, concurring in the Court's opinion:

I concur in Judge Owen's opinion for the Court, affirming appellant's 12 month sentence for involuntary manslaughter, but add a brief explanation as to why the "criminal negligence" guideline, U.S.S.G. § 2A1.4(a)(1), is applicable and why the recklessness, found by the District Court, may be used only to select a sentencing point within the "criminal negligence" guideline range and not as "relevant conduct," *id.* § 1B1.3, which would permit use of the "reckless conduct" guideline, *id.* § 2A1.4(a)(2).

Though the statute makes no distinction between involuntary manslaughter by criminally negligent conduct and involuntary manslaughter by reckless conduct, the Government elected to file an information charging McHugh with "criminal negligence." The information narrowed the charged offense, and once McHugh pled guilty to counts charging "criminal negligence,"[1] that became the "offense conduct" that the Guidelines instruct is to be used to determine the applicable sentencing guideline.[2] Where the offense conduct is involuntary manslaughter by conduct that is "criminally negligent," the appropriate guideline is section 2A1.4(a)(1), which specifies a base offense level of 10. Had the plea and resulting conviction been to involuntary manslaughter by conduct that is "reckless," the appropriate guideline would have been section 2A1.4(a)(2), which specifies a base offense level of 14.

However, since section 2A1.4 includes more than one base offense level, attention must be given to the "relevant conduct" guideline, which instructs that

[T]he base offense level where the guideline specifies more than one base offense level, ... shall be determined on the basis of the following:

(1)(A) all *acts* and omissions committed ... by the defendant....

*Id.* § 1B1.3(a)(1)(A).

It is arguable that the "reckless conduct" found by the District Court is "relevant conduct," warranting application of the "reckless conduct" guideline. I agree with the Court's implicit assumption, however, that the applicable guideline remains the "negligent conduct" guideline. Section 1B1.3(a)(1)(A) permits selection of an enhanced guideline for "acts" committed by the defendant. In this case, no "act" of the defendant distinguishes criminally negligent conduct from reckless conduct. The distinction arises only from an enhanced degree of *mens rea*, the state of mind with which the defendant acted. We have never regarded *mens rea* as an "act" of the defendant for purposes of the relevant conduct guideline, nor should we. The natural meaning of "act" connotes conduct, and the meaning of the guideline should not be strained to include state of mind. Indeed, we have previously ruled that where a defendant's acts are relevant conduct, justifying enhancement of an offense level, a defendant cannot avoid such enhancement on the ground that he lacked *mens rea* as to the

---

1. The two counts, one for each victim, charged that "Michael T. McHugh, did kill [the victim] in the commission, without due caution and circumspection, of a lawful act which produced death by criminal negligence...."

2. The Guidelines instruct as follow:

Determine the offense guideline section in Chapter Two (Offense Conduct) most applicable to the offense of conviction (*i.e.*, the *offense conduct charged in the count of the* indictment or *information of which the defendant was convicted.*)

U.S.S.G. § 1B1.2(a) (emphasis added).

enhancing conduct. *See United States v. Obi,* 947 F.2d 1031, 1032 (2d Cir.1991). Similarly, where, as here, no additional acts occurred, a relevant conduct enhancement should not be permitted because of the presence of *mens rea.*

I also agree that, though we generally require a sentencing judge to say that the same sentence would have been given under either of two overlapping guidelines before we will sustain a sentence imposed under the higher, incorrectly selected guideline, *see United States v. Bermingham,* 855 F.2d 925, 934 (2d Cir.1988), a remand is not necessary in this case since Judge Pooler's sentencing remarks leave no doubt that she would reimpose a 12 month sentence, even using the "criminal negligence" guideline. If by any chance we have assumed too much in this regard, she may so advise the parties, in which event a motion to recall our mandate would be warranted.

For these reasons, I concur in Judge Owen's opinion.